```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------- X
                                                                  :
SYLVIA GAIL KINARD,                                               :
                                                                  :
                              Plaintiff,                          :    **MEMORANDUM DECISION**
                                                                  :    **AND ORDER**
              - against -                                         :
                                                                  :    19-cv-1065 (BMC)
DR. RUDOLPH L. CREW et al.,                                       :
                                                                  :
                              Defendants.                         :
                                                                  :
----------------------------------------------------------------- X
```

**COGAN**, District Judge.

Before me is defendants' motion for summary judgment in the above-captioned employment discrimination case. Plaintiff contends both that she engaged in protected activity by referring a gender discrimination complaint to the CUNY Central Office and that defendant Dr. Crew fired her in retaliation for doing so. Defendants respond that this was not protected activity because plaintiff's job required her to handle complaints of discrimination, and one of the avenues by which she could perform her job was by making such referrals to the CUNY Central Office. Moreover, they argue that even if it was technically protected activity, Dr. Crew had already determined not to rehire plaintiff, thus precluding a finding of retaliation.

The two issues bearing on the outcome of this motion are therefore (1) whether plaintiff has satisfied her *prima facia* burden of showing that her referral was protected activity, and if so, (2) whether there is a genuine issue of fact regarding the cause of plaintiff's termination. Although I agree with plaintiff that she engaged in protected activity, no reasonable jury could find that defendants chose not to renew her contract because of that activity. The facts are clear that defendants had already determined not to renew her contract before she made the referral.

## BACKGROUND

Beginning in 2009, plaintiff served as Medgar Evers College's ("MEC") Chief Diversity Officer and, soon after, started working as its Title IX Coordinator as well. As part of the latter role, plaintiff was charged with investigating complaints of sexual harassment and discrimination at the school. When Dr. Rudolph Crew was hired to serve as MEC's president in 2013, plaintiff continued in these positions and reported directly to Dr. Crew.

During the period that plaintiff worked under Dr. Crew, there appears to have been at least sporadic friction between the two. For example, in late 2017, they sharply diverged over how to handle a particular complaint of sexual harassment against one of the school's coaches. Although the parties disagree about the merits and content of these exchanges, it is undisputed that Dr. Crew believed the complaint to warrant the coach's dismissal and plaintiff believed that "there was no credible proof to support the allegation." Dr. Crew eventually fired the coach, despite plaintiff's entreaties against doing so.

Dr. Crew had also, on several occasions, reprimanded plaintiff by written memorandum about matters related to her work. In one such communication, Dr. Crew said the following: "Please be aware that this is a continuing concern I have for your work. You seemingly do not heed counsel or correct behavior that is dysfunctional for the organization." He concluded the memorandum by telling plaintiff that if her behavior continued to "remain the same . . . [he would] address this matter appropriately." In another memorandum, Dr. Crew stated: "It has come to my attention that you are consistently submitting timesheets late. . . . It has been discussed with you prior that we will only honor the most recent timesheets." Dr. Crew went on to say that, going forward, plaintiff would be required to submit her timesheets directly to the General Counsel. Again, the parties appear to disagree about the merits of these censures, but

not about the fact that they were issued. These memoranda were issued in January and February 2018.

It is further undisputed that more than two months prior to plaintiff's termination, Dr. Crew was, as plaintiff characterizes it, "explor[ing] the possibility of terminating" plaintiff's employment. This is evidenced in particular by an email chain between MEC's Executive Director of Human Resources, Tanya Isaacs, and a member of CUNY's Office of Counsel, Katherine Raymond, written between February 5, 2018 and February 9, 2018. In that dialogue, Ms. Isaacs conveyed to Ms. Raymond that, barring any legal concerns, MEC "will be moving forward in non-reappointing" plaintiff. When Ms. Raymond replied that there were no contractual obstacles preventing plaintiff's termination, Ms. Isaacs confirmed that the termination was going to happen. She further predicted that "there will be a fight on [plaintiff's] end," which the present lawsuit would seem to have confirmed.

Several weeks later, Dr. Brenda Greene, Chair of MEC's English Department, filed a discrimination complaint with plaintiff concerning the school's provost, Dr. Augustine Okereke. According to plaintiff, when she met with Dr. Crew to discuss the complaint, he "stated that Dr. Greene was a troublemaker" and could not be trusted. Plaintiff presumed that this response was motivated in part by Dr. Crew's close personal relationship with Provost Okereke. Soon after, Provost Okereke filed a complaint of his own against Dr. Greene, citing stalking and discrimination on the basis of his national origin. When plaintiff attempted to interview Provost Okereke one-on-one, MEC's newly-appointed Chief Legal Officer insisted on being present and often interjected in the proceeding in Okereke's favor.

Ultimately, plaintiff concluded that Dr. Crew's apparent bias against Dr. Greene and the fact that he was "close personal friends" with Provost Okereke made it impossible "for her to

3

conduct a fair and unbiased investigation of the competing Greene and Okereke complaints." She therefore referred both complaints to the CUNY Central Office for external review and investigation. Plaintiff represents that she purposefully did not tell Dr. Crew that she was planning on referring the complaint until after CUNY accepted the referral because she feared Dr. Crew would overrule that decision and adjudicate the complaint himself. In the eight years that plaintiff had served as MEC's Chief Diversity Officer and Title IX Coordinator, she had never before referred a case to the CUNY Central Office.

Plaintiff says that she first informed Dr. Crew of the referral on April 9, 2018. The next day, Dr. Crew admonished plaintiff for attending a Personnel and Budget meeting even though she had attended the meetings in the past without incident. The day after that, Dr. Crew sent plaintiff a letter criticizing her conduct in attending the meeting. And by letter dated April 26, 2018, plaintiff was informed that her appointment would not be renewed and her employment would end on June 30, 2018.

Prior to – but on the same day of – plaintiff's termination, Dr. Crew sent plaintiff a written memorandum expressing his dismay at plaintiff's failure to submit required documentation to the CUNY Athletics Conference:

> It has come to my attention that since March 2018, despite repeated requests to you, CUNY Athletics Conference has been unable to obtain MEC's Title IX training documentation. In fact, astoundingly, MEC is the only member of the CUNY Athletics Conference that has not submitted the required training documentation.
>
> …
>
> I consider your failure to provide the CUNY Athletics Conference the necessary Title IX training documentation and some of your other recent conduct demonstrations of an uncooperative and unprofessional approach in your job performance.

4

Nevertheless, plaintiff maintains that her termination (non-renewal) was a result of unlawful retaliation for an action she believes was protected under Title VII of the Civil Rights Act of 1964 – i.e., the referral of Dr. Greene's complaint to the CUNY Central Office.

Defendants move for summary judgment, arguing that (1) plaintiff's referral of Dr. Greene's complaint was not protected activity under Title VII, and (2) even if it was, the referral was not the cause of her termination.

## DISCUSSION

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation marks omitted). However, "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997).

A dispute as to a material fact is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The opposing party must put forward some "concrete evidence from which a reasonable juror could return a verdict in his favor" to withstand a motion for summary judgment. Id. at 256. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." Id. at 255. When

deciding a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id.

### I. Protected Activity

On summary judgment, a plaintiff alleging unlawful retaliation under Title VII "must adduce evidence sufficient to permit a rational trier of fact to find . . . that he engaged in protected participation or opposition under Title VII." Kessler v. Westchester Cty. Dep't of Soc. Servs., 461 F.3d 199, 205-06 (2d Cir. 2006) (citing Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001)). In determining whether a plaintiff has met her burden at this initial stage, a court should "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Cifra 252 F.3d at 216.

"Protected activity" under the retaliation provisions of Title VII can manifest as either opposition or participation. See Littlejohn v. City of New York, 795 F.3d 297, 316 (2d Cir. 2015). "The opposition clause makes it unlawful for an employer to retaliate against an individual because she 'opposed any practice' made unlawful by Title VII." Id. For example, "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges" are all protected opposition. Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990).

However, for employees whose job it is to report or investigate workplace discrimination, "merely to convey others' complaints of discrimination" is not protected. Littlejohn, 795 F.3d at 318. Rather, such an employee must "actively support[] other employees in asserting their Title VII rights" for her actions be protected under the statute. Id. (internal quotation marks omitted). This active support must be tantamount to the ordinary meaning of "oppose," which is to say

6

"[t]o resist or antagonize . . .; to contend against; to confront; resist; [or] withstand." See Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn., 555 U.S. 271, 276 (2009) (*colatus*[1]). As I have previously explained the standard:

> The only workable test is to examine the motivation of the reporting employee and determine if he was being an advocate for the alleged victim, or acting with the purpose of supporting his employer, *i.e.*, being a "good corporate citizen" in making the report. That is going to be a question of fact unless the facts permit no reasonable conclusion other than that the employee was pursuing his organizational role.

Ezuma v. City University of New York, 665 F. Supp. 2d 116, 124 (E.D.N.Y. 2009).

On balance, plaintiff has provided more than enough support to permit a jury to find that she engaged in protected opposition. According to her declaration and exhibits, plaintiff cannot recall ever, in her eight years as defendants' Chief Diversity Officer and Title IX Coordinator, referring a case to the CUNY Central Office prior to the incident at issue. Even though that option was technically available, she had uniformly forwarded her findings to the MEC President, who would then decide what action should be taken. In any event, CUNY policy dictates that "the President will review the complaint investigation report and, when warranted by the facts, authorize such action as he or she deems necessary" and "[t]he President will sign a form that will go into each investigation file, stating what, if any, action will be taken pursuant to the investigation." Thus, both common practice and express school procedure would appear to dissuade "reporting out."

Several factors led plaintiff to believe that "due to potential discriminatory bias and conflicts of interest," the CUNY Central Office should investigate Dr. Greene's complaint, not MEC. First, when Dr. Crew, the President of MEC, learned of the complaint, he was instantly dismissive of the allegations and even stated that the complainant, Dr. Greene, was "a trouble-

---

[1] I.e., edited citation.

maker." Second, during plaintiff's interview with Dr. Okereke, MEC Counsel inexplicably showed up and insisted upon sitting in. According to plaintiff, he thereafter "continuously interjected as if he were representing Dr. Okereke." Finally, plaintiff was aware that Dr. Crew had a close relationship with Dr. Okereke, which in her mind foreclosed the possibility that Dr. Greene's complaint would get a fair shake if Dr. Crew were the arbiter.

Accepting the above points as true – and crediting all inferences in plaintiff's favor, as I must – there is little doubt that plaintiff reasonably believed that she had to take the extraordinary step of going around Dr. Crew by referring the complaint to the CUNY Central Office. The fact that this avenue was never officially foreclosed means little when considering the rare (indeed, unprecedented) nature of the practice. In fact, plaintiff didn't even inform Dr. Crew that she was going to refer the complaint to CUNY until she was assured that the Central Office would accept the referral. This, in itself, implies that plaintiff believed that her action was in opposition to Dr. Crew.

Moreover, Dr. Crew's harsh treatment of plaintiff immediately after she informed him of the referral evidences that plaintiff's belief was well-founded. For example, plaintiff says that the day after she informed Dr. Crew of the referral, he publicly berated her for attending a Personnel and Budget meeting, which she had attended on several other occasions without admonishment. Dr. Crew also accused Dr. Greene of improperly inviting plaintiff, which is especially probative because it was Dr. Greene's complaint that plaintiff had referred. Plaintiff later learned that Dr. Crew actually solicited a vote to sanction Dr. Greene for inviting plaintiff to the meeting.

Considering the irregularity of sending complaints to CUNY; the events that led plaintiff to believe that sending the complaint was the only way Dr. Greene's grievance would be

8

properly investigated; and Dr. Crew's behavior just after finding out that plaintiff had sent the complaint, it is reasonable to conclude that plaintiff was engaging in protected opposition.

## II. Cause of Termination

Nevertheless, the evidence leads to no other reasonable conclusion than that defendants were not going to renew plaintiff's contract, regardless of her opposition. Defendants' Exhibit 12 is the most powerful demonstration of this fact. That exhibit, described above, is an email chain between MEC's Executive Director of Human Resources (Tanya E. Isaacs) and CUNY's Office of Counsel (Katherine Raymond), two months before plaintiff referred Dr. Greene's complaint. The subject line of the conversation is "Sylvia Kinard's Agreement" and its purpose was to inquire of CUNY's in-house counsel whether she foresaw any legal obstacles to not rehiring plaintiff. Edited for format, that email chain looks like this:

| | | |
|---|---|---|
| MEC: | FYI [*forwarding a copy of plaintiff's employment agreement*] (2/2/2018) |
| MEC: | Thoughts? (2/5/2018) |
| MEC: | We will be moving forward in non-reappointing unless you have more concerns. She is indeed excluded. (2/6/2018) |
| MEC: | Hi Kathy, I just want to make sure you didn't see anything in this agreement which would preclude us from removing Sylvia. Thanks, Tanya (2/9/2018) |
| CUNY: | Hi, Tanya, there is nothing in that agreement that gives her any right to permanent employment. The only right in there is to be appointed for 2011-2012. She got a one-year appointment letter, so she is clearly on yearly appointments and can be non-reappointed. As an excluded employee, she would not have any union rights. (2/9/2018) |
| MEC: | Thank you and have a great weekend !!! Tanya (2/9/2018) |
| CUNY: | You are welcome, you too. Is this really maybe going to happen? (2/9/2018) |
| MEC: | Yes. We will probably move her sooner than later and assign her somewhere else until her appointment runs out if so. I can expect |

9

there will be a fight on her end.  Oy.  (2/9/2018)[2]

Clearly, then, defendants were planning not to renew plaintiff's contract well before the protected activity at issue in this case.  This effectively severs the causal link between the referral and the adverse employment action.  See Wilkinson v. Nord Anglia Educ. Ltd., No. 17-cv-7421, 2019 WL 3430662, at *10 (S.D.N.Y. July 30, 2019) ("It is well established that an adverse employment action cannot serve as the basis for a retaliation claim if the action was set in motion before a plaintiff engaged in protected activity." (citing cases)).

Plaintiff's attempts to explain away or reinterpret this conversation are unpersuasive.  First, she argues that this is just "evidence that the Defendants explored the possibility of terminating the Plaintiff."  No reasonable jury could accept that suggestion.  Isaacs first said, apparently unprompted, that "[MEC] will be moving forward in non-reappointing unless you have more concerns."  When Ms. Raymond responded that she had no concerns and asked if the non-reappointment was "really maybe" going to happen, Ms. Isaacs stated definitively: "Yes."  This was more than a mere possibility; it was confirmed by MEC's Executive Director of Human Resources herself.

Plaintiff next says that the timing of the termination on April 26, 2018, is suspect considering that it did not occur until after Dr. Crew learned that plaintiff had referred the complaint on April 9, 2018.  But the email chain definitively explains this delay as well, as it confirms that defendants had planned to take action in parallel with the date that plaintiff's "appointment [ran] out."[3]

---

[2] This email would appear to fall under the business record exception to the rule against hearsay.  In any event, plaintiff has not raised an evidentiary objection.

[3] Defendants say that "[e]mployees like plaintiff, hired on one-year contracts running from July 1 to June 30, must be notified no later than May 1 of their term whether they will be reappointed or not."  Plaintiff disputes the May 1 notification practice, but does not dispute that her term ended in June 2018.

10

Indeed, defendants had, prior to the referral, expressed dissatisfaction with plaintiff and her work on numerous occasions. For instance, Dr. Crew and plaintiff butted heads several times regarding the best way to handle an unrelated sexual allegation complaint – Dr. Crew wanted to, and eventually did, fire the accused; plaintiff argued that the evidence against the accused was insufficient. Further, on January 18, 2017, Dr. Crew issued a memorandum to plaintiff regarding her time sheets, which read in part:

> It has come to my attention that you are consistently submitting timesheets late; more specifically I have just received timesheets for the period October-January 2017. It has been discussed with you prior that we will only honor the most recent timesheets.

And on February 6, 2018, Dr. Crew issued another memorandum to plaintiff regarding her continued shortcomings:

> Please be aware that this is a continuing concern I have for your work. You seemingly do not heed counsel or correct behavior that is dysfunctional for the organization. Submitting timesheets is actually an easy task and it is beyond me why they are in some cases weeks/months beyond the day in which they are due. If this is not a job you want as I pointed out on February 2, then your behavior will remain the same. As such, I will address this matter appropriately.

Plaintiff argues that these earlier incidents show how Dr. Crew was primed to retaliate against her when he got the chance. But as shown above, when one considers the timing of the decision to fire her, the earlier incidents do no more than explain conclusively why that decision was made. Plaintiff's fraught relationship with Dr. Crew cannot be transformed into a retaliatory firing for her handling of Dr. Greene's complaint when the decision to fire her was made before she took action on Dr. Greene's complaint.

---

The fact that other personnel, such as the "athletics coach," were terminated prior to a date near the expiration of their contract is likewise unconvincing. For one thing, the coach was fired for a specific, discrete cause – namely, an inappropriate relationship with a student – whereas the supposed cumulative faults and failings leading to plaintiff's termination did not call for immediate dismissal.

11

Furthermore, the fact that plaintiff disagrees with the merits of Dr. Crew's criticisms is irrelevant to both their existence and their unambiguous demonstration that defendants had other, lawful reasons not to extend her contract another year. As an at-will employee, plaintiff was subject to termination for even incorrect reasons (so long as they were lawful reasons). See Lauture v. Int'l Bus. Mach. Corp., 216 F.3d 258, 262-63 (2d Cir. 2000) ("[A]n at-will employee can be fired for good cause, bad cause, or no cause at all . . . ." (quoting Fadeyi v. Planned Parenthood Ass'n of Lubbock, Inc., 160 F.3d 1048, 1051-52 (5th Cir. 1998)).

Finally, plaintiff contends that "the Defendants did not even follow the course of action contemplated in their discussions about terminating the Plaintiff," referring to the fact that they didn't assign plaintiff to another position to wait out her tenure. But this is of no matter considering that Ms. Isaacs said that MEC "will *probably* move her sooner than later and assign her somewhere else until her appointment runs out" (emphasis added). The fact that defendants weren't positive about all aspects of how to implement plaintiff's termination takes little if anything away from the proof that they had already decided on the termination itself. No reasonable juror would conclude otherwise.

### III. Remaining Claims

Plaintiff also sues all defendants pursuant to 42 U.S.C. § 1981 under both a traditional liability theory and a Monell custom or policy theory. However, "suits against CUNY are equivalent to suits against the State of New York and are therefore barred by the Eleventh Amendment." Clissuras v. City University of New York, 359 F.3d 79, 83 (2d Cir. 2004). Thus, those claims are dismissed as against CUNY, MEC, and Dr. Crew in his official capacity. The single remaining federal claim is the § 1981 claim against Dr. Crew in his individual capacity, which must be dismissed because plaintiff does not allege racial discrimination. See Lauture,

12

216 F.3d at 260-61; Simpson ex rel. Simpson v. Uniondale Union Free School Dist., 702 F. Supp. 2d 122, 130-31 (E.D.N.Y. 2010) (explaining that to state a § 1981 claim, "courts in this Circuit require plaintiffs to demonstrate that . . . there has been a substantive violation of plaintiff's right to make contracts based on his race").

As for plaintiff's claim under New York State Executive Law § 296 ("NYSHRL"), which forbids an employer from retaliating against an "individual [who] has opposed any practices forbidden" by that law, the Second Circuit has "repeatedly noted that claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." Torres v. Pisano, 116 F.3d 625, 629 n.1 (2d Cir. 1997). Thus, that claim is likewise dismissed for the reasons stated above.

However, I will not here determine the merits of plaintiff's city law ("NYCHRL") claim, which is to be analyzed under a different standard than are Title VII and NYSHRL claims. See Weber v. Parfums Gienchy, Inc., 49 F. Supp. 2d 343, 355 n.5 (S.D.N.Y. 1999). Pursuant to 28 U.S.C. § 1367(c)(3), I have discretion to decline to exercise supplemental jurisdiction over a claim if "the district court has dismissed all claims over which it has original jurisdiction." Since plaintiff's federal claims have been dismissed, I see no reason to maintain jurisdiction over the remaining city law claim. See Brzak v. United Nations, 597 F.3d 107, 114 (2d Cir. 2010); Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent [now "supplemental"] jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims.").

## CONCLUSION

Accordingly, defendants' [23] motion for summary judgment is granted. The Clerk is directed to enter judgment, dismissing plaintiff's federal and state claims on the merits and her NYCHRL claim without prejudice.

**SO ORDERED.**

_____<br>U.S.D.J.

Dated: Brooklyn, New York
       July 24, 2020